IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DIRECT MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:06-CV-534-TC |

This case arises out of Plaintiff Direct Mortgage Corporation's ("Direct Mortgage") claim for coverage under a fidelity bond issued by Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). Direct Mortgage seeks coverage for its liability to third party financial institutions that unknowingly purchased fraudulently-obtained mortgages from Direct Mortgage and then demanded that Direct Mortgage buy back the mortgages under warranty clauses in the purchase agreements. Direct Mortgage settled with those entities and submitted a claim to National Union. National Union denied the claim on the basis that Direct Mortgage did not suffer a direct loss under the fidelity bond.

The parties have filed cross-motions for partial summary judgment[1] on the coverage

---

[1]The cross motions focus solely on the issue of coverage. The court's ruling in this order does not dispose of Direct Mortgage's claim for breach of contract for not adjudicating or paying the claim, nor does it dispose of the claim for breach of the implied covenant of good faith and fair dealing for failing to promptly and reasonably investigate and settle the claim. Because those two claims are factually and analytically distinct from the issue of coverage, they are not moot.

issue.[2] Because the court finds that the fidelity bond's unambiguous language does not cover the indirect, consequential loss suffered by Direct Mortgage, National Union is entitled to partial summary judgment on that issue.

### A.  **Factual Background**[3]

Direct Mortgage is a wholesale lending company that generates revenue by originating mortgages through its broker network and selling those loans in the secondary market. National Union issued Direct Mortgage a Financial Institution Bond which contains various types of coverage,[4] including protection against the risk of employee dishonesty (the "Fidelity Bond").[5]

Direct Mortgage filed its claim with National Union after it discovered that its employee, Lloyd Rutherford,[6] falsified various documents necessary to close the loans. For example, Mr. Rutherford purportedly changed the value of the appraisals, altered the square footage of the

---

[2] National Union also has filed a Motion to Strike the Expert Reports of Derk G. Rasmussen and Robert E. Wilcox (Dkt # 48). Because the expert reports have no bearing on the court's analysis and ruling on the cross-motions for summary judgment, the court denies the Motion to Strike without prejudice.

[3] This is just a summary. For a full description of the facts, see the parties' briefs.

[4] Other portions of the Financial Institution Bond include agreement to cover loss of property on the premises (Insuring Agreement B), loss of property in transit (Insuring Agreement C), loss from forgery or alteration of a negotiable instrument by an agent of Direct Mortgage (Insuring Agreement D), loss relating to third party's securities fraud (Insuring Agreement E), loss relating to counterfeit currency (Insuring Agreement F), and loss relating to unauthorized access to computer systems (Rider # 10).

[5] Generally speaking, a fidelity bond is an insurance contract by which an insurer indemnifies the insured against loss "arising from the lack of integrity or honesty of an employee or of a person holding a position of trust, such as a loss from embezzlement." Black's Law Dictionary (8th ed. 2004) (definition of "fidelity insurance" under "insurance").

[6] National Union admits, for the purposes of its motion only, that Mr. Rutherford was an employee of Direct Mortgage, as that term is defined in the insurance policy.

property, falsified income verifications, and, in some cases, replaced the property description to which the loan pertained with a different property description.  Direct Mortgage then sold the loans to its customers—including CitiMortgage, Countrywide Home Loans, GMAC Mortgage, and Washington Mutual—which, upon discovery of the fraud, demanded (based on Direct Mortgage's repurchase obligations in the sales agreements) that Direct Mortgage buy back the fraudulently-obtained loans.

Direct Mortgage settled with its customers.  Then Direct Mortgage filed a claim with National Union for loss based on its settlement obligations.  National Union contends that Direct Mortgage's claim does not fall within the type of loss covered by the Fidelity Bond.

**B.**     **The Fidelity Bond**

The relevant portion of the Financial Institution Bond is titled the "Amended Fidelity Agreement."  The language, located in Rider # 8 of the bond, creates the "fidelity bond" in dispute here.  According to Rider # 8, National Union agreed to provide coverage to Direct Mortgage for:

> (A)   Loss resulting from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.  Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
>
>   (a)   to cause the Insured to sustain such loss, and
>
>   (b)   to obtain financial benefit for the Employee or another person or entity.
>
> As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including:

3

> salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

(Financial Institution Bond No. 690-71-28, Fidelity Insuring Agreement ["Fidelity Bond"], attached as Ex. A to Def.'s Mem. Supp. Mot. Summ. J.)  The bond contains the following relevant exclusions:

> This bond does not cover: . . .
>
> (*l*)   damages of any type for which the Insured is legally liable, except compensatory damages, but not multiples thereof, arising directly from a loss covered under this bond; . . .
>
> (n)   indirect or consequential loss of any nature . . . .

(Fidelity Bond Exclusions 2(*l*) & 2(n).)

### C.   Coverage Under the Fidelity Bond

According to the Fidelity Bond language, Direct Mortgage, in order to prevail on its claim of coverage, must present sufficient evidence that Mr. Rutherford was an employee who committed dishonest or fraudulent acts, with a manifest intent to harm Direct Mortgage and to benefit himself or others, that resulted in a loss covered under the Fidelity Bond.  Because the court finds that Mr. Rutherford's actions did not result in a loss covered under the Fidelity Bond,[7] Direct Mortgage is not entitled to coverage.

#### 1.   Split Among Jurisdictions (Proximate Cause v. "Direct Means Direct")

No Utah law exists on the question of recovery under fidelity bonds.  "In deciding an issue that the Utah Supreme Court has not addressed, we must look to lower state court

---

[7]The court does not reach the question of whether Mr. Rutherford committed the acts with a manifest intent to harm Direct Mortgage and to benefit himself or others.

decisions, decisions of other states, federal decisions, and other available resources in deciding how the Utah Supreme Court would decide the issue." FDIC v. Oldenburg, 34 F.3d 1529, 1539 (10th Cir. 1994) (internal citation and quotation marks omitted).

Direct Mortgage and National Union present two competing interpretations of "loss" under the Fidelity Bond. Their positions reflect a split in jurisdictions on the issue of what constitutes a direct loss under a fidelity bond.

Direct Mortgage advocates application of the "proximate cause" standard to determine whether the loss directly resulted from Mr. Rutherford's actions. See, e.g., Scirex Corp. v. Federal Ins. Co., 313 F.3d 841, 848-50 (3d Cir. 2002) (adopting proximate cause test; applying Pennsylvania law); Resolution Trust Corp. v. Fidelity & Deposit Co. of Maryland, 205 F.3d 615, 655 (3d Cir. 2000) (same; applying New Jersey law); Jefferson Bank v. Progressive Cas. Ins. Co., 965 F.2d 1274, 1282 (3d Cir. 1992) (same; applying Pennsylvania law); First Nat'l Bank of Louisville v. Lustig, 961 F.2d 1162, 1167-68 (5th Cir. 1992) (same; applying Louisiana law); Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc. 854 A.2d 378 (N.J. 2004) (same). These courts have essentially equated "direct loss" with a loss proximately caused by the dishonest employee's acts. An Illinois court described the proximate cause standard as requiring a finding that the employee's conduct was "a substantial contributing factor to the harm suffered." RBC Mortgage Co. v. National Union Fire Ins. Co. of Pittsburgh, PA, 812 N.E.2d 728, 736 (Ill. App. Ct. 2004). The courts adopting the "proximate cause" standard have borrowed from tort law and other insurance contexts. See, e.g., Jefferson Bank, 965 F.2d at 1280-81. In Utah, proximate cause is "that cause which, in the natural and continuous sequence[] (unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred. It

is the efficient cause--the one that necessarily sets in operation the factors that accomplish the injury." Thurston v. Workers Comp. Fund of Utah, 83 P.3d 391, 395 (Utah Ct. App. 2003) (internal quotation marks and citation omitted).

National Union advocates a narrower reading, sometimes referred to as the "direct means direct" approach. See, e.g., Vons Cos., Inc. v. Federal Ins. Co., 212 F.3d 489 (9th Cir. 2000) (interpreting California law, the court rejected proximate cause test); Patrick Schaumburg Autos. v. Hanover Ins. Co., 452 F. Supp. 2d 857 (N.D. Ill. 2006) (same); RBC Mortgage Co. v. National Union Fire Ins. Co. of Pittsburgh, 812 N.E.2d 728, 736-37 (Ill. App. Ct. 2004) (same); Travelers Ins. Cos. v. P.C. Quote, Inc., 750 N.E.2d 614, 621 (Ill. App. Ct. 1991) (same); Aetna Cas. & Surety Co. v. Kidder, Peabody & Co., Inc., 246 A.D.2d 202 (N.Y. Sup. Ct. 1998) (same); Tri City Nat'l Bank v. Federal Ins. Co., 674 N.W.2d 617 (Wis. Ct. App. 2003) (same). The "direct means direct" approach requires a court to focus on whether the employer suffered actual depletion of funds as a direct (immediate) result of the employee's conduct.

**2.    Cases Adopting "Direct Means Direct" Approach are More Persuasive**.

The court finds that the Utah Supreme Court would most likely adopt the "direct means direct" approach because cases advocating that approach are better reasoned and more consistent with the traditional nature of fidelity bonds and the language of the Fidelity Bond at issue. See Nielsen v. O'Reilly, 848 P.2d 664, 666 (Utah 1992) (noting the purpose and nature of policy is relevant to interpretation of insurance contract). For example, adopting the proximate cause approach would effectively ignore the term "direct" in the Fidelity Bond because a direct loss is narrower than a proximately caused loss. See, e.g., RBC Mortgage, 812 N.E.2d at 736 ("[T]he phrase 'resulting directly from' suggests a stricter standard of causation than mere proximate

6

cause, and requires more than a substantial cause, since the words imply that the loss must flow 'immediately,' either in time or space, from the fraud."); Aetna Cas. & Sur., 246 A.D.2d at 563-64 ("The logical extension of [the proximate cause argument], that settlement with a third-party under [facts showing that employee broker engaged in insider trading], would create the potential for almost any loss, not initially direct to the insureds, to become a direct loss, a subterfuge that would render the exclusion in this case [which was identical to Exclusion 2(*l*) here] clearly meaningless."); Tri City Nat'l Bank, 674 N.W.2d at 683 (noting that fidelity bond is not a liability insurance policy and to adopt the proximate cause standard would allow not only coverage for actual depletion of funds at the hands of dishonest employee but loss occasioned by employer's payment to third parties for its vicarious liability for employee's acts). Similarly, the proximate cause standard is drawn from tort law and liability insurance contexts, neither of which is analogous to the typical first party coverage offered by fidelity bonds. See, e.g., Aetna Cas. & Sur., 246 A.D.2d at 212-13 (describing difference between fidelity and general liability policies). Most importantly, the proximate cause standard is inconsistent with the language and nature of the Fidelity Bond, which excludes coverage for compensatory damages owed due to an indirect loss.

   **3. Direct Mortgage's Claimed Loss is Not Covered By the Fidelity Bond.**

  Based on a review of the language in the Fidelity Bond, the undisputed facts, the history and overall purpose of fidelity bonds, and the persuasiveness of the decisions adopting the "direct means direct" approach, the court concludes, for the reasons set forth below, that Direct Mortgage's claimed loss is not covered by the Fidelity Bond.

    a.  <u>The Fidelity Bond is Not a Liability Insurance Policy.</u>

Typically, a fidelity bond is intended to provide indemnification of a direct loss suffered by the insured at the hands of a dishonest employee. It is not intended to be a liability policy. For example, in New York,

> a fidelity bond is not a liability policy within the meaning of [New York insurance law]. <u>The difference turns on what is defined as the risk.</u> Insurance covers the liability of the insureds to a third-party, while fidelity bonding covers the loss of property owned by the insureds or held by the insureds, as a consequence of employee dishonesty.

<u>Aetna Cas. & Sur.</u>, 246 A.D.2d at 212-13 (emphasis added). Similarly, in <u>Couch on Insurance</u>, the authors note:

> As fidelity bonds, financial institution bonds are in fact a form of insurance. However, <u>due to the risk that is insured under the bond, it is not a liability insurance policy</u>. . . . <u>[They are] indemnity contracts</u>. . . . In other words, whereas liability insurance covers the liability of insured to a third-party, fidelity bonds cover the loss of property owned by the insureds or held by the insureds, as a result of employee dishonesty or other perils.

11 Steven Plitt et al., <u>Couch on Insurance</u> § 167:43 "Financial Institution Bonds" (3d ed. 2008) (emphasis added); 1 Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance</u> § 1:16 "Performance Bonds—Fidelity Insurance" (3d ed. 2008) ("The contract [fidelity insurance] is essentially one of indemnity for the personal loss to the employer."). <u>See also</u> <u>Tri City</u>, 674 N.W.2d at 793 ("The <u>intended role of the coverage</u> should be kept in mind when construing policy language; <u>the nature and purpose of the policy as a whole</u> have an obvious bearing on the insured's <u>reasonable expectations</u> as to the scope of coverage and on <u>whether the risk involved was, or should have been, contemplated by the insurer in computing its rates</u>.") (internal citation omitted; emphasis added).

Much of the language in the Fidelity Bond tracks the language of other fidelity bonds interpreted by courts. One distinction is that the word "direct" was removed from the coverage language and placed only in the exclusions section of the policy.[8] But the legal significance of this change is not clear. It appears, from the overall language of the Fidelity Bond, that the claimant must still demonstrate a direct loss before a finding of coverage is appropriate. (See Fidelity Bond Exclusion 2(*l*) (excluding coverage for damages "of any type for which the Insured is legally liable, except compensatory damages . . . arising <u>directly</u> from a loss covered under this bond.") (emphasis added); Exclusion 2(n) (excluding "<u>indirect</u> or consequential <u>loss</u> of any nature") (emphasis added).) Exclusions 2(*l*) and 2(n), when read together, lead the court to conclude that coverage is limited to direct losses suffered by the insured.

Contrary to Direct Mortgage's contention, the language in Exclusion 2(*l*) does not convert the Fidelity Bond into a liability insurance policy. That exclusion says that the bond does not cover "damages of any type for which the Insured is <u>legally liable, except compensatory damages</u>, . . . <u>arising directly from a loss covered under this bond</u>." (Fidelity Bond Exclusion 2(*l*) (emphasis added).) Direct Mortgage contends that the plain language of Exclusion 2(*l*) contemplates coverage for compensatory damages paid out by the insured based on liability to third parties arising out of a loss covered under the Fidelity Bond. (See Pl.'s Omnibus Mem. at 26-27.) The court disagrees. Indeed, other courts have rejected similar arguments. See, e.g., Lynch Properties, Inc. v. Potomac Ins. Co. of Ill., 140 F.3d 622, 629 (5th Cir. 1998) ("Mere

---

[8] Even if the court is to strictly construe exclusions and interpret ambiguous language in favor of the insured, this does not remove the requirement that Direct Mortgage show some sort of direct connection between the claimed loss and the insured event.

insertion of the words 'legal liability' into an employee dishonesty policy does not transform the policy into a liability policy."); First Nat'l Bank of Louisville v. Lustig, 975 F.2d 1165, 1167, 1167 n.2 (5th Cir. 1992) (rejecting argument that almost identical provision containing "legally liable" suggests liability coverage or creates an ambiguity as to the type of coverage intended); Aetna Cas. & Sur., 246 A.D.2d at 566 ("That the insured may be liable to a third-party for a loss of money resulting from employee dishonesty does not transform a policy covering the insureds against a direct loss into one indemnifying against liability . . . .") (internal quotation marks and citation omitted).

  Also, Direct Mortgage's interpretation does not answer the question before the court: What is a "loss covered under this bond"? The more plausible interpretation of that language is that liability coverage for compensatory damages paid to a third party is limited to loss of that third party's property which was being held by the insured in a bailment or trust situation (another type of coverage in the Fidelity Bond (see "On Premises" and "In Transit" coverage for loss of property) that is not at issue here). See, e.g., Lynch Properties, 140 F.3d at 629 ("Although employee dishonesty policies may cover the loss of third-party property in the possession of the insured, these policies do not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees.") (internal citations omitted); Aetna Cas. & . Sur., 246 A.D.2d at 213 (interpreting nearly identical exclusionary language, the court noted that "[t]hird-party claims arise only within this specific context: the employee acted dishonestly and property is taken from or lost by the insureds/employer that has custody of the property.").

b.     Direct Mortgage's Claimed Loss is Too Contingent to be Direct.

Direct Mortgage's loss was contingent on the occurrence of a series of events that were not inevitable, and such a contingency takes the loss outside the scope of the Fidelity Bond. See, e.g., Vons Companies, Inc., 212 F.3d at 944 (insured's delay in filing claim with insurer until after settlement of liability actions "illustrates the 'conditional' nature of the loss, taking it out of policy"); RBC Mortgage, 812 N.E.2d at 736 (holding that employer's losses "were derived, not directly from the conduct of [employee], but from [employer's] breach of the warranty contained in the brokerage agreement with [third party]."). Here, the cause of Direct Mortgage's actual financial loss was third parties' enforcement of the warranty and buy-back provisions. The losses were not immediate or readily ascertainable at the time of Mr. Rutherford's actions. And if the third parties never discovered the fraud or if they chose not to enforce the clauses, Direct Mortgage would not have suffered the loss it now claims.[9]

Direct Mortgage alternatively argues that it suffered a direct loss as soon as the loans were issued and sold to the third parties because it was "on the hook" for violation of the warranty and buy-back provisions. (See Pl.'s Omnibus Mem. at 16-17, 23, 30-31.) Direct

---

[9]If Direct Mortgage had not entered into agreements containing that language, its financial liability for Mr. Rutherford's fraud would not have been as clear. That is, absent the specific re-purchase clauses in the sales agreements (which were added as part of Direct Mortgage's routine business of selling loans on the secondary market (Pl.'s Omnibus Mem. at 32)), the third parties' recourse would have to incur damages and sue Direct Mortgage for vicarious liability for the torts of Mr. Rutherford. (The law is relatively clear that fidelity bonds do not create third party beneficiaries and that such individuals who suffer loss may not maintain direct claims against the insurance company. See, e.g., School Employees Credit Union v. National Union Fire Ins. Co. of Pittsburgh, PA, 839 F. Supp. 1477, 1480 (D. Kan. 1993) (fidelity bond is form of first party coverage that does not provide an implied cause of action for injured party against insurer).)

Mortgage further contends (unpersuasively) that the amounts demanded and eventually paid simply quantified the losses Direct Mortgage sustained when it made the loans based on Mr. Rutherford's fraud. (See, e.g., id. at 26, 40.) But although Direct Mortgage was potentially "on the hook" as soon as the loans were sold, its loss was theoretical at that point. No demands had been made and no defaults or foreclosures had occurred. Allowing coverage for the so-called immediate loss would be inconsistent with the Tenth Circuit's holding that the insured must prove that it "suffered an actual loss by a preponderance of the evidence. . . . Bookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss [are] not recoverable." FDIC v. United Pac. Ins. Co., 20 F.3d 1070, 1080 (10th Cir. 1994) (applying Utah law).

If the court required National Union to reimburse Direct Mortgage for losses resulting from the warranty or repurchase provisions in the sales agreements to which National Union was not a party, this would essentially allow Direct Mortgage to unilaterally, and improperly extend coverage under the Fidelity Bond.

For all the foregoing reasons, the court finds that the claimed loss is not covered by the Fidelity Bond.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.  National Union's Motion for Summary Judgment (Dkt # 28) is GRANTED, and Direct Mortgage's claim for coverage is dismissed. The court holds, however, that Direct Mortgage's claims for breach of contract and breach of the implied covenant of good faith and fair dealing remain, as they were not the subject of the cross-motions and are not moot as a result

of the court's ruling on coverage.

2. Direct Mortgage's Cross-Motion for Partial Summary Judgment (Dkt # 44) is DENIED.

3. National Union's Motion to Strike the Expert Reports of Derk G. Rasmussen and Robert E. Wilcox (Dkt # 48) is DENIED WITHOUT PREJUDICE.

DATED this 8th day of August, 2008.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
Chief Judge